## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| FRANCES NOE KETTERING, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:12-0885 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM AND ORDER</u>

In this case seeking judicial review of denial of Social Security benefits, Plaintiff Frances Noe Kettering has filed a Motion for Summary Judgment [Doc. # 11] ("Plaintiff's Motion").   Defendant Michael J. Astrue, Commissioner of Social Security, also filed a Motion for Summary Judgment [Doc. # 12] ("Defendant's Motion") and a Brief in Support [Doc. # 13] ("Defendant's Brief").  The motions now are ripe for decision.  Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court concludes that Defendant's Motion should be **denied**, that Plaintiff's Motion should be **granted**, and that this case should be **remanded** to the Commissioner for further proceedings.

## I.     BACKGROUND

### A.     Procedural Background

Kettering filed an application for disability benefits with the Social Security Administration ("SSA") alleging disability beginning May 9, 2006.  The claim was denied initially and on reconsideration.  Kettering requested an administrative hearing before an Administrative Law Judge ("ALJ") to review the denial of benefits.

On July 8, 2008, ALJ Gary J. Suttles held a hearing, and subsequently issued a decision on July 24, 2008, finding that Kettering was not disabled.[1]  Kettering's attorney requested review by the Appeals Council, which granted the request and remanded to the ALJ for further evaluation of the evidence.[2]  The Appeals Council stated that the ALJ's decision indicated that Kettering had back surgery in 2006, but that subsequent examinations did not reveal significant abnormalities.  However, the Appeals Council noted additional evidence indicating that Kettering had required additional back surgery in July 2008 and again in August 2008, and that she had been admitted to a hospital for mental health treatment in March 2008.

Upon remand, on December 2, 2009, ALJ Suttles held a supplemental hearing.[3]

---

[1]     R. 45-84 (hearing transcript); R. 149-62 (decision denying benefits).

[2]     R. 199-202.

[3]     R. 85-145.

Kettering was represented by counsel and a vocational expert testified, but no medical expert was called.  On December 18, 2009, the ALJ issued a partially favorable decision that found Kettering disabled beginning on August 1, 2008, but not on her alleged onset date of May 9, 2006.[4]  On January 20, 2012, the Appeals Council granted review and agreed with the ALJ's holding that Kettering was not disabled before August 1, 2008.  The Appeals Council further determined that Kettering's disability had ended on August 9, 2009, due to medical improvement.[5]

Kettering filed this case on March 22, 2012, seeking judicial review of the denial of benefits from May 9, 2006, through July 31, 2008.  Contemporaneously with her complaint in this Court, she filed a new application for disability with the SSA. The SSA ruled favorably on the application, finding Kettering disabled as of August 9, 2009.[6]

## B.    **Factual Background**

Plaintiff Kettering alleges that her disability began on May 9, 2006.  On December 24, 2003, Kettering was injured in a motor vehicle accident, which caused neck and back pain, muscle spasms, and decreased range of motion.  In the period

---

[4]     R. 23-44.

[5]     R. 1-10.  The ALJ's opinion in December 2009 had recommended continuing disability review in 24 months, *i.e.*, December 2011.  R. 39.

[6]     Exhibit A to Plaintiff's Motion.

before her alleged onset date, she was treated by various physicians, therapists, and chiropractors.[7]  She continued to work in her job as an accountant.

Beginning in September 2005, Kettering was treated by William F. Donovan, M.D., an orthopedist.[8]   Dr. Donovan conducted an orthopedic evaluation on September 13, 2005, including physical examination and x-rays, and diagnosed her with herniated nucleus pulposus ("HNP"), or herniated disc, in three locations: HNP C3-4, HNP C5-6, and HNP L5-S1.   He stated that the injury was a direct result of her motor vehicle accident on December 24, 2003, and noted that she had received treatment from multiple doctors since the accident but had persistent problems with her neck and lower back.   He recommended multiple treatments, including epidural steroid injections and probable surgery.[9]  He also stated that, based on his evaluation on September 13, 2005, Kettering had difficulty with many motions, including extended sitting, lifting, bending, pushing and pulling, and that he anticipated some permanent limitations.[10]

Dr. Donovan's subsequent testing supported his diagnosis.   An MRI of Kettering's cervical spine in October 2005 revealed a central disc herniation at the C3-

---

[7]     R. 314-34, 484-511, 528-615.

[8]     R. 472-614, 744-46.

[9]     R. 486-89.

[10]    R. 488.

4 level.  Neurological testing of the lumbar spine in November 2005 revealed right L5-S1 lumbar radiculopathy.[11]  In an attempt to relieve her symptoms, Dr. Donovan sent Kettering to Jose Reyes, Jr., M.D., for cervical epidural steroid injections. However, Kettering's problems persisted.  She also suffered a post-dural puncture headache as a result of the steroid injections.[12]

On January 13, 2006, Dr. Donovan performed a lumbar hemilaminectomy L5-S1 right with posterior disc excision.[13]  His records state that the findings at surgery confirmed the diagnosis of "HNP L5-S1 right" and that Kettering's injuries were consistent with a motor vehicle accident.[14]

On February 20, 2006, about five weeks after her surgery, Kettering returned to work.  Dr. Donovan's x-rays from April 2006 showed good alignment of the vertebrae, no arthritis, and decreased motion.[15]  However, as of May 9, 2006, Kettering stopped working.  On May 17, 2006, Dr. Donovan wrote a letter stating that Kettering had stopped working as of May 10, 2006, because of increased pain to her

---

[11]     R. 367, 485, 529.

[12]     R. 353-76.

[13]     R. 377-86, 430-45.

[14]     R. 437, 440-42.

[15]     R. 438.

lower back in the area of her surgery.[16]  Plaintiff's alleged onset date of May 9, 2006,

therefore was her last day of work.

On July 11, 2006, Dr. Donovan wrote another letter on Kettering's behalf,

stating that after returning to work "patient has developed an increased evidence of

instability to the lumbar spine."[17]  He further stated,

> Based on most recent clinical examination, 7/11/06, [Kettering] is not
> able to work in any capacity.  Patient will be referred for additional
> rehabilitation therapy to help strengthen her low back.  Patient is unable
> to sit for more than two hours in an eight hour day because of the lumbar
> spine instability caused by the accident of 12/24/03 and facilitated by the
> surgery of 1/13/06.  In addition, patient is not capable of doing repetitive
> bending, lifting, pushing, pulling, and twisting.[18]

In Dr. Donovan's records from August and October 2006, he continued to state his

opinion that Kettering was totally disabled and unable to work.  He noted pain to her

lower back and in her right shoulder and neck.  His records indicate that Kettering

slipped and fell on a wet floor at home in August, causing further injury to her neck

and back.[19]

On September 12, 2006, the SSA reviewed Kettering's records and conducted

---

[16]     R. 436.

[17]     R. 434.

[18]     R. 434. *See* R. 388-39 (records from physical therapy from same period).

[19]     R. 431-33.

an assessment of her physical residual functional capacity ("RFC").[20]  The consulting

doctor concluded that Kettering was capable of standing, walking, and sitting for six

hours of an eight-hour workday.   The consulting doctor further stated that Dr.

Donovan's statements regarding Kettering's inability to work were not fully supported

by objective findings.[21]

On October 13, 2006, Kettering had an MRI of her cervical spine.   The records

state that Kettering had "central disc herniation impinging upon the subarachnoid

space" at the C3-4 level.   The rest of her cervical spine was within normal limits.[22]

During the period from October 2006 through August 2007, Kettering also was

treated by Gregory Shannon, M.D., for persistent abdominal pain apparently unrelated

to her neck and back pain.[23]

Throughout 2007, Kettering continued to receive treatment for her neck and

back pain.  On referral from Dr. Donovan, she was treated briefly at the Texas Pain

---

[20]     R. 408-15.

[21]     R. 414.   Somewhat inconsistently, the consulting doctor stated that Kettering's
         statements of limitations **were** supported by the evidence, but were not expected to
         meet the duration requirement for disability benefits.  R. 413.

[22]     R. 528.

[23]     R. 420-29, 648-76. After performing an esophagogastroduodenoscopy, Dr. Shannon
         diagnosed Kettering with mild esophagistis, a hiatus hernia, and other conditions.  R.
         649.

Institute,[24] and then started treatment with Cheryl D. White, M.D., at the Center for Pain Recovery.[25]  Dr. White's records from her initial appointment in February 2007 indicate that the lumber laminectomy in January 2006 had relieved the numbness in Kettering's right leg, but that Kettering continued to complain of pain in two major areas: first, in her neck, right shoulder, and arm; and second, in her lower back.[26]  Dr. White noted that past treatments, including physical therapy, traction, surgery, and injections, had not provided long-term relief.  Dr. White also noted that Kettering had a series of falls, including one the previous day which required treatment at an emergency room for a forehead laceration.   Dr. White performed a physical examination, adjusted Kettering's medications, and ordered lumbar and cervical MRIs.

 An MRI of Kettering's cervical spine in March 2007 revealed "mild cervical spondylosis" with cervical muscle spasms and "mild disc degeneration," but no evidence of disc herniation, central canal, or foraminal stenosis.[27]  An MRI of her lumbar spine revealed mild disc degeneration and nerve root enlargement, but

---

[24]     R. 478-80.

[25]     R. 473-77, 512-27, 746-50.

[26]     R. 473-77.

[27]     R. 518-19.

otherwise normal results.[28]  Dr. White scheduled Kettering for joint injections and adjusted her medications.[29]  She also referred her to the Sports Therapy Center for physical therapy.[30]

In April 2007, Kettering's physical therapist noted progressively worsening neck pain over several years resulting from Kettering's motor vehicle accident and a series of falls, as well as severe radiculopathy.  She further noted limitations in Kettering's daily activities, including sitting, standing and walking.[31]  However, Kettering completed only two scheduled therapy sessions, and canceled the remaining three sessions due to an upper respiratory infection.[32]

In May 2007, Kettering returned to Dr. White and reported weakness, numbness, and tingling in her right arm, and the return of "occipitalgic-type headaches."  Dr. White ordered an electrodiagnostic evaluation and another course of cervical physical therapy and traction.  Because Kettering's pain was interfering with

---

[28]     R. 520-23.

[29]     R. 477, 537.

[30]     R. 725-43.

[31]     R. 727.

[32]     R. 733.

her sleep, Dr. White added a prescription to help her sleep.[33]

Over the next few weeks, Kettering completed ten sessions of physical therapy. Her therapist reported to Dr. White that Kettering had achieved short-term relief, but that her overall condition "remain[ed] irritable and easily provoked by prolonged sitting, driving, or [upper extremity] movement."  Kettering had remaining weakness in her neck, shoulders, and right arm and wrist.  She continued to report constant pain.[34]

On May 30, 2007, Kettering saw A.Y. Shukla, M.D., a neurologist to whom Dr. White had referred her.[35]  Dr. Shukla noted Kettering's worsening pain and numbness and her severe headaches, as well as the failure of past treatments to relieve her pain symptoms.  After an electrodiagnositic study, he diagnosed her with mild chronic C5-C6 and C6-C7 radiculopathy bilaterally.

In June 2007, Dr. White noted at a follow up examination that the physical therapist and the neurologist had arrived at the same conclusion, *i.e.*, chronic C5-7 radiculopathy.[36]  Kettering reported continued pain on her right side and especially

---

[33]     R. 747.

[34]     R. 743.

[35]     R. 615-21.

[36]     R. 749.

upper shoulder, which now had begun to radiate to her right hand.  She also reported two cervicalgic headaches.  Dr. White offered catheter-based cervical epidural steroid injections, with knowledge of Kettering's prior postdural puncture headache, and Kettering stated she wished to undergo the treatment.  However, the treatments provided only short-term relief, and Kettering continued to suffer the same symptoms of pain and headaches.  Dr. White then offered radiofrequency ablation, with the caveat that the treatment would be temporary and palliative at best.  Kettering stated she wished to proceed with the treatment.[37]

Kettering also received psychiatric treatment throughout 2007 and 2008.  Beginning in January 2007, she was treated by Jaime Ganc, M.D., for depression and other mental conditions.[38]  This mental health treatment overlapped with her treatments for neck and back pain, and Dr. Ganc's records frequently note that Kettering was coping with pain and headaches.

In January, at her initial appointment with Dr. Ganc, Kettering reported a history of moderate depression, with irritability, mood swings, and periods of mania.[39]

---

[37]     R. 750.

[38]     R. 622-633.

[39]     At around the same time, on December 22, 2006, a consultant with the SSA completed a Psychiatric Review Technique.  *See* R. 458-71.  The consultant concluded that Kettering's depression was a medically determinable impairment but
(continued...)

Over the following months she reported some improvement with Seroquel and other medications, although she continued to struggle with depression as she coped with personal stressors and her pain and headaches.[40] In August 2007, Dr. Ganc's records indicate that Kettering was very anxious around people, experiencing tension, shakiness, and sweating. She had a minor car accident but had been afraid to leave her car. She also had been suffering with a headache for two weeks without relief.[41] In October, Kettering reported that she had been scheduled for gynecological surgery and was worried about her recovery. She reported muscle spasms and migraine headaches, but no depression.[42]

However, in November 2007, after her surgery, Kettering presented with symptoms of depression, and reported that her credit was very bad because of manic spending behavior in the past.[43] In January 2008, Dr. Ganc's records reflect mostly Kettering's complaints about her severe pain and her inability to sleep because of the

---

[39]      (...continued)
did not satisfy the diagnostic criteria.

[40]      R. 623-33.

[41]      R. 696.

[42]      R. 695.

[43]      R. 694.

pain.[44]  On March 3, 2008, Dr. Ganc indicated concern that Kettering had become

delusional after she reported that her daughter had been hit by a boy, her four tires had

been slashed, her house had been broken into, and the sheriff had threatened her with

a pistol to stop making trouble in the neighborhood.[45]

On March 25, 2008, Kettering attempted suicide by overdose of her medication.

She was transported by ambulance to Oakbend Medical Center,[46] and later admitted

to Texas West Oaks Hospital with a diagnosis of major depressive disorder.[47]  Her

medical records reflect severe urges to commit suicide with suicidal ideation, and

racing thoughts.  She was treated with medication and released on April 6, 2008.

After her discharge and throughout the rest of 2008, Kettering was treated by Marco

Renazco, M.D.[48]  During this period she reported symptoms of depression, anxiety,

panic, impulsive spending, isolative behaviors, and low energy and mood.

Beginning in June 2008, the records reflect that Kettering received additional

treatment for her neck and back pain at Orthopaedic Associates in Katy, Texas.[49]

---

[44]     R. 693.

[45]     R. 692.

[46]     R. 912-76.

[47]     R. 751-52, 761-836, 837-911.

[48]     R. 977-94.

[49]     R. 754-60.

Kettering initially was seen by Alan J. Rechter, M.D., on June 24, 2008, who noted a globally decreased range of motion but no significant abnormality.  Dr. Rechter referred Kettering to a specialist, Vivek Kushwaha, M.D., because Kettering had long-term pain and "the inability to work as well from these injuries for me is questionable . . . but there may be some other issues here at play that I am just not aware of."[50]

Several days later, Kettering saw Dr. Kushwaha and reported neck and arm pain, numbness and tingling, frequent headaches, and disturbed sleep due to pain.  She also reported constant lower back pain that traveled down her right leg with numbness and tingling, and an increase in pain with prolonged sitting or standing. Dr. Kushwaha noted that past treatments including physical therapy, epidural steroid injections, and the 2006 laminectomy had failed to provide long term relief.  His  physical examination noted Kettering's decreased range of motion, pain in the neck and back, and some muscle spasm.  Dr. Kushwaha ordered further MRIs.[51] The subsequent MRI of the cervical spine showed similar findings as previous MRIs, with degenerative changes and diffuse bulging, but no significant herniation or stenosis.  The tests of the lumbar spine showed disk space narrowing and degenerative changes at the level of her previous surgery.  Dr. Kushwaha ordered a diskogram to evaluate whether

---

[50]    R. 757.

[51]    R. 757-58.

Kettering had diskogenic pain.[52]

The remainder of Kettering's medical records are after August 1, 2008, the date as of which the ALJ granted disability benefits.   However, because Kettering challenges the ALJ's choice of August 1, 2008 as her onset date, these later records are informative for sake of comparison.

In August 2008, Dr. Kushwaha performed a disk replacement at L5-S1. Postoperatively, Kettering had significant left leg pain that progressively worsened.[53] From September 17-24, 2008, Kettering was admitted to Memorial Hermann Hospital under Dr. Kushwaha's care for surgical intervention to revise the disk replacement. When her pain did not improve, Dr. Kushwaha then performed posterior spinal (lumbar) fusion.  After the fusion, her pain was improved.[54]

On August 10, 2009, Arthur Hadley, M.D., performed a consultative examination on behalf of the SSA.  Dr. Hadley reported that Kettering complained of numbness in her pelvis and left thigh, and right buttock pain radiating down her leg.[55] He performed a physical examination and concluded that Kettering could walk

---

[52]     R. 756.

[53]     R. 1037.

[54]     R. 1033-34.

[55]     R. 1097-1111.

normally, squat, and hop.[56]  He opined that "[t]here is no reason she cannot return to the workplace," and suggested starting her with sedentary work for two hours per day, adding 20 minutes per week to her schedule until she reached an eight-hour workday.[57]

Shortly thereafter, in September 2009, Kettering was treated by Marvin Chang, M.D., at Texas Pain Consultants, for chronic pain.[58]  Dr. Chang's records indicate that, since her spinal fusion in August 2008, Kettering had persistent pain in her legs and buttocks.  A recent CT scan had revealed post-surgical changes to her vertebrae at the L5-S1 level.    Dr. Chang first recommended and performed steroid injections.[59]  However, the injections produced no benefits, and Kettering felt they had aggravated her pain.[60]  Thereafter, Dr. Chang noted that medication and injection therapies had failed, and that Kettering was not a candidate for further surgery.  He told Kettering that the next step would be a  possible spinal cord stimulator intervention.  Kettering indicated that she wanted to try it, and so Dr. Change ordered a psychological

---

[56]     R. 1098.

[57]     R. 1101.

[58]     R. 1116-25.

[59]     R. 1119, 1124-25.

[60]     R. 1116.

evaluation before her participation in the trial.[61]

This consultative exam by Dr. Hadley and the treatment by Dr. Chang both occurred after August 9, 2009, which the Appeals Council ruling had set as the end of Kettering's eligibility period.  However, upon Kettering's subsequent application for benefits in 2012, Kettering was found disabled as of August 9, 2009.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.[62]  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[63]  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return

---

[61]    R. 1116.

[62]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

[63]    FED. R. CIV. P.  56(a).  *See Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

a verdict for the nonmoving party."[64]

## III.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to two inquiries: first, whether the final decision is supported by substantial evidence on the record as a whole and, second, whether the Commissioner applied the proper legal standards to evaluate the evidence.[65]  "Substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[66]  It is more than a mere scintilla and less than a preponderance.[67]

When applying the substantial evidence standard on review, the court scrutinizes the record to determine whether such evidence is present.[68]  In determining whether substantial evidence of disability exists, the court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work

---

[64]     *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

[65]     *See Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

[66]     *Audler*, 501 F.3d at 447 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[67]     *Id*.; *Perez*, 415 F.3d at 461; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

[68]     *Perez*, 415 F.3d at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

history.[69]  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[70]   Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.[71]   The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.[72]  In short, conflicts in the evidence are for the Commissioner, not the courts, to resolve.[73]

## IV.   ANALYSIS

### A.   Statutory Basis for Benefits

Social Security disability insurance benefits are authorized by Title II of the Social Security Act.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[74]   "Disability" is defined as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

---

[69]     *Perez*, 415 F.3d at 462 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)).

[70]     *Id.* at 461 (citing *Richardson*, 402 U.S. at 390); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).

[71]     *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

[72]     *Audler*, 501 F.3d at 447; *Masterson*, 309 F.3d at 272.

[73]     *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272.

[74]     42 U.S.C. § 423(c) & (d).

lasted or can be expected to last for a continuous period of not less than 12 months."[75]

## B.      **Determination of Disability**

When determining whether a claimant is disabled, an ALJ must engage in a five-step sequential inquiry, as follows: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment in Appendix 1 of the regulations; (4) whether the claimant is capable of performing past relevant work; and (5) whether the claimant is capable of performing any other work.[76]   The claimant has the burden to prove disability under the first four steps.[77]  If the claimant successfully carries this burden, the burden shifts to the Commissioner at Step Five to show that the claimant is capable of performing other substantial gainful employment that is available in the national economy.[78]   Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut the finding.[79]  A

---

[75]      42 U.S.C. § 423(d)(1)(A).

[76]      *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.  The Commissioner's analysis at Steps Four and Five is based on the assessment of the claimant's residual functional capacity ("RFC"), or the work a claimant still can do despite his or her physical and mental limitations.  *Perez*, 415 F.3d at 461-62.  The Commissioner assesses the RFC before proceeding from Step Three to Step Four.  *Id.*

[77]      *Perez*, 415 F.3d at 461; *Myers*, 238 F.3d at 619.

[78]      *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.

[79]      *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.

finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.[80]

In this case, the ALJ determined at Step One that Kettering had not engaged in substantial gainful activity since her alleged onset date of May 9, 2006.  At Step Two, he found that Kettering had three severe impairments: degenerative disc disease, asthma, and depression.  At Step Three, he found that Kettering's impairments, considered singly or in combination, did not meet or medically equal an impairment listed in the Social Security regulations.

Before proceeding to Step Four, the ALJ considered Kettering's residual functional capacity ("RFC").  He determined that she had become disabled on August 1, 2008, and thus found different RFCs for the periods before and after that date.  The ALJ concluded that, prior to August 1, 2008, Kettering had the RFC to perform sedentary work with some limitations.[81]  However, for the period beginning on August 1, 2008, he determined that Kettering was "unable to perform even a limited range of sedentary exertion."[82]

At Step Four the ALJ determined that Kettering was able to perform her past relevant work as an audit clerk before August 1, 2008, but was not able to perform the

---

[80]    *Perez*, 415 F.3d at 461 (citing 20 C.F.R. § 404.1520(a)).

[81]    R. 26.

[82]    R. 37.

work from August 1, 2008, and forward.   At Step Five, considering her age, education, work skills, experience, and RFC, he determined that no jobs existed in the national economy that Kettering could perform after August 1, 2008.  He therefore concluded that Kettering was disabled from August 1, 2008 forward.  Due to the possibility of medical improvement, he recommended a continuing disability review 24 months later.

### C.   Plaintiff's Argument for Reversal

The ALJ held that Kettering "was not disabled prior to August 1, 2008, but became disabled on that date."[83]  Plaintiff challenges the ALJ's selection of August 1, 2008, as the onset of her disability, and cites to authority stating that the Commissioner was required to consult a medical advisor when inferring her onset date. Plaintiff further argues that substantial evidence does not support the ALJ's conclusion that she was not disabled on her alleged onset date of May 9, 2006.

The Fifth Circuit has held that the Commissioner must consult a medical advisor when inferring the onset date in certain cases:

> [I]n cases involving slowly progressive impairments, when the medical evidence regarding the onset date of a disability is ambiguous and the Secretary must infer the onset date, [Social Security Ruling] 83–20 requires that that inference be based on an informed judgment. *The Secretary cannot make such an inference without the assistance of a*

---

[83]    R. 23.

*medical advisor.*[84]

SSR 83-20 "places the burden of consulting a medical advisor on the Secretary, not the claimant."[85]   Relevant factors in determining the onset date are the claimant's allegation as to when disability began; the date the disability caused the claimant to stop working; and the medical evidence.[86]  Medical evidence is the primary element.[87]

In support of his selection of August 1, 2008, as the date of onset for Kettering's disability, the ALJ cites only to medical records from September 2008 showing that Dr. Kushwaha performed a surgical removal of an artificial disk and, subsequently, a spinal fusion.  The ALJ stated, "Due to the claimant's 2 surgeries and subsequent need to heal, the Administrative Law Judge finds that the claimant was unable to perform even a limited range of sedentary exertion [as of August 1, 2008]."[88] He found her statements concerning her symptoms not credible prior to August 1, 2008, to the extent they were inconsistent with his RFC assessment, but "generally

---

[84]   *Spellman v. Shalala*, 1 F.3d 357, 362 (5th Cir. 1993) (emphasis added) (citing Social Security Ruling ("SSR") 83-20, 1983 WL 31249 (1983)).

[85]   *Id.* at 363 n. 9.

[86]   *Id.* at 361 (citing SSR 83-20; *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990)).

[87]   *Id.*

[88]   R. 37.

credible" beginning on August 1, 2008.[89]

Plaintiff cites to evidence supporting her claim of disability starting May 9, 2006, due to back impairments, pain, and major depression.[90]  She further cites to Fifth Circuit authority holding that an ALJ "must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."[91]

As in *Spellman*, Kettering's impairments—both physical and mental—were "slowly progressing."  Although her motor vehicle accident occurred on December 24, 2003, she returned to work after the accident, and continued to work for more than two years while seeking treatment for her condition.  She alleges disability as of May 9, 2006, which is the date she stopped working—a date *Spellman* characterized as

---

[89]   R. 27, 37.  In the section of his opinion discussing the period before August 1, 2008, the ALJ held that the opinions of Dr. Donovan, who had treated Kettering since September 2005, were entitled to "little weight" because they were "unsupported by objective clinical findings and [were] inconsistent with the evidence considered as a whole."  R. 35.  In support, the ALJ cited to several items from the record.  First, the ALJ cited to records of Dr. Rechter, who saw Kettering one time, on June 24, 2008, before referring Kettering to Dr. Kushwaha.  R. 759 (stating that Kettering's inability to work was "questionable" and referring her to Dr. Kushwaha). As noted above, Dr. Kushwaha subsequently treated Kettering, performing a disk replacement and a posterior spinal fusion.  R. 1033-37.  In addition, when holding that Dr. Donovan's opinions were entitled to little weight, the ALJ relied on records from Dr. Hadley and Dr. Chang.  The ALJ's reliance on these medical findings is curious, given that the findings were from August and September 2009, more than a year after August 1, 2008, the date the ALJ selected as the onset of Kettering's disability.  These records are not relevant to whether Kettering was disabled during the period from May 9, 2006, through July 31, 2008.

[90]   Plaintiff's Motion, at 6-18.

[91]   *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

"often very significant."[92]   Although the ALJ cites some evidence indicating that Kettering was capable of working before August 1, 2008,[93] other evidence in the record is to the contrary.  In particular, Kettering cites Dr. Donovan's opinion that she was unable to work as of May 10, 2006, as supported by his records of physical examinations, clinical observations, and medical testing; her psychiatric symptoms throughout 2007 and 2008, culminating in a ten-day admission to a psychiatric hospital; and her treatments for pain by Dr. White, Dr. Kushwaha, and physical therapists, among others, spanning the period from 2006 through 2008.

Based on a careful review of the record, the Court concludes that, as in *Spellman*, the medical evidence regarding onset of Kettering's disability was ambiguous.[94]  The ALJ therefore was required to consult a medical advisor when inferring the onset date.

Defendant argues that, even though the ALJ failed to consult a medical advisor,

---

[92]    *Spellman*, 1 F.3d at 361.

[93]    R. 35 (citing records from Dr. Rechter).  The ALJ also relied upon Kettering's statements in her application and hearing testimony regarding her daily activities, which he concluded were greater than her alleged functional limitations.  R. 33.

[94]    *Cf. Luckey v. Astrue*, 458 F. App'x 322, 326 (5th Cir. 2011) ("Luckey's disability onset date was not ambiguous, such that the ALJ needed to consult a medical examiner"); *Orphey v. Massanari*, 268 F.3d 1063, at * 3 (5th Cir. 2001) ("Unlike the situation in *Spellman* . . . the contemporaneous medical evidence in this case is not ambiguous, and there was no medical evidence prior to the expiration of Orphey's insured status indicating that Orphey was suffering from a mental illness.").

no remand is required because the error was harmless.[95]  The Court disagrees.  As explained in *Spellman*, "'it is essential that an onset date be correctly established and supported by the evidence'" because the onset date affects "the period for which the individual can be paid."[96]  As stated above, the evidence is ambiguous as to whether Kettering's disability began before August 1, 2008.

This accordingly must be remanded to the Commissioner for further proceedings.  On remand, the Commissioner is instructed to consult a medical advisor in determining the proper onset date.

## V.    CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment [Doc. # 12] is **DENIED**.  It is further

**ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. # 11] is **GRANTED**.  It is further

**ORDERED** that this case is **REMANDED** to the Commissioner for further proceedings in accordance with this opinion.

---

[95]    Defendant's Brief, at 8-9 (arguing that medical evidence from June and July 2008 supported the ALJ's inferred onset date).

[96]    *Spellman*, 1 F.3d at 361 (citing SSR 83-20).

SIGNED at Houston, Texas, this **12**[th] day of **April, 2013**.

Nancy F. Atlas
United States District Judge